## CRAWFORD v. WHITE et al.
### No. 2361.

Court of Civil Appeals of Texas. El. Paso.
Feb. 13, 1930.
Rehearing Denied March 6, 1930.

Lea, McGrady, Thomason & Edwards and Jones, Goldstein, Hardie & Grambling, all of El Paso, for appellant.

Turney, Burges, Culwell & Pollard, of El Paso, for appellees.

WALTHALL, J.

L. M. Crawford, appellant here, brought this suit in trespass to try title, against Z. T. White and his wife, Maude B. White, James G. McNary and his wife, Ruth R. McNary, Otis C. Coles, Paul Harvey and his wife, Katherine W. Harvey, Britton Davis, E. J. Davis, Southern Townsites Company, and the First Mortgage Company of El Paso, Tex. E. J. Davis and Britton Davis disclaimed, and the suit proceeded to trial and judgment as to all others. The trial court heard the evidence, and at its conclusion instructed a verdict in favor of appellees, and entered judgment on the court's instructed verdict. The evidence covers over three hundred pages of the record in addition to a number of maps appearing as exhibits in the case, and from which maps much of the evidence is directed to such maps and the surveys delineated thereon. We will not be able, in the opinion, to do more than state briefly what we conceive to be the controlling contention made by the parties, and our conclusions as to the law arising thereon.

The land, the title to which is involved in this appeal, and to which the trial court adjudged and decreed that appellant take nothing by his suit as against any of the appellees, as to that tract of land, is described as follows:

"That certain tract or parcel of land which under the opinion of the Supreme Court of the United States rendered in the case of New Mexico v. Texas, 275 U. S. 279, 48 S. Ct. 126, 72 L. Ed 280, pending in that court and announced by that court on the 5th day of December, 1927, is in the County of El Paso and State of Texas, said land being more particularly described as follows, towit:

"That certain tract of land situated in El Paso County, Texas, and described as beginning at the intersection of the South line of the main paved concrete road, known as the Country Club Road which runs just North of the Club House of the El Paso Country Club, with the East or left bank of the present Rio Grande; thence continuing in an Easterly direction along the South line of said paved road known as the Country Club Road to the intersection of said line with the Easterly ——— of the concrete road which runs from said County Highway in a Southerly direction to the property now occupied by the El Paso Country Club; thence in a Southerly direction along the Easterly line of said Country Club road to the southerly bank of a drainage ditch constructed in recent years for the drainage of adjacent land; thence continuing in an Easterly, Southerly and Southerly direction along the right bank of said drainage canal to the point of intersection between said drainage canal and the Northerly line of the property now in possession of the El Paso Country Club; thence west along the Northerly line of said property now occupied by the El Paso Country Club to a point which is the Northwest corner of said Country Club property; thence South 1653.5 feet to the Northwesterly bank of an old river bed; thence along what was the right bank of an old river bed as follows:

"South 45° 40' West 238.8 feet; South 61° 28' West 551.2 feet; South 87° 55' West 406.5 feet; North 23° 55' West 1100 feet; thence West 1550 feet to the left bank of the present Rio Grande; thence in a Northerly direction up the left bank of the present Rio Grande to the place of beginning."

Appellant's claim to the land in controversy might be better understood by stating, as in his brief, that his claim included the land occupied by the Country Club, but for reasons stated was not embraced in his suit. Appellant refers to the land claimed by him as the "Country Club Bend," and makes the contention that within the district under consideration, and from 1850 to 1905, the Rio Grande made no avulsive change, but that it did move toward the east by accretion until it had reached the position shown for the 1905 river on the map (Exhibit F). Appellant makes the further contention that in the year 1905 the Rio Grande made an avulsive change at a point more than twenty miles north of the Country Club, which resulted in the abandonment of the 1905 channel from such northern point down to station 47 on Exhibit F, just north of the Country Club building. Appellant makes the further contention that from 1905 until shortly after 1911 the Rio Grande remained in its old channel from station 47 around the Country Club bend and back to the southwest to where such bend crosses the 1850 river line, making only some slight accretive changes until shortly after February, 1911, when the Rio Grande made another avulsive change so as to move over west to its present location; that is, appellant claims that the land under consideration was an accretion to land which on September 9, 1850, lay on the west or right bank of the Rio Grande, in New Mexico, and opposite the land in controversy, and at that time owned by Francisco Garcia, and which land, by grant, by deeds, by judgment, by patent from the United States, and by other and subsequent mesne conveyances from Francisco Garcia, the title comes down to appellant. We do not understand that appellees dispute the title of appellant to any of the lands claimed by appellant west of the Rio Grande as the river ran on the 9th day of September, 1850, or as it ran at the time of the filing of this suit. However, appellant claims that the Rio Grande, in the district under consideration, moved from its 9th day of September, 1850, position in an easterly direction to a position it occupied in 1905, by accretion, and that, by reason of such movement, the accreted land, by reason of the law, became a part of the Francisco Garcia grant, and that such accreted land is the land here sued for. Appellant submits that the evidence shows such movement of the Rio Grande, and that the fact thus shown should have been submitted to the jury. Should it not be the law, as contended by appellant, that, by reason of the movement of the Rio Grande by accretion, the accreted land thus made became a part of the Francisco Garcia land, it would be immaterial what the evidence would show as to the kind or character of the movement made by the Rio Grande at any time subsequent to the 9th day of September, 1850.

No part of the Francisco Garcia land, whether by grant, treaty, patent from the United States, or any character of record title under which appellant claims title to the land in controversy, was ever conveyed or undertook to convey any of said land as being in the state of Texas, or as being east of the Rio Grande as that river ran on the 9th day of September, 1850, when the United States by an act of the Congress of that date (9 Stat. 447) submitted a proposition to the state of Texas that the western boundary between this state and the western boundary of the then territory of New Mexico, at the point involved in this controversy, that is, on the parallel of 32 degrees of north latitude to the Rio Bravo del Norte (Rio Grande) "and then with the channel of said river to the gulf of Mexico."

The Legislature of the state of Texas, in November, 1850, accepted the proposition as to said boundary, and on December 13, 1850, so notified the President of the United States, who thereupon issued his proclamation "that the said Act of Congress of the United States of the 9th of September, last, is in full force and operation." Undoubtedly the boundary between the state of Texas and the state of New Mexico between the parallel of 32 degrees north latitude and the parallel of 31 degrees 47 minutes north latitude was fixed and established where the channel of the Rio Grande was on the 9th of September, 1850, as stated in the proclamation of the President of the United States.

It is true as insisted by appellant there is nothing in the proposition of the Congress of the United States or in its acceptance by the Legislature of Texas in any way referring to the doctrines of accretion and avulsion as applying to this river boundary.

We have found nothing in any of the acts of the Congress of the United States, or its treaties with Mexico, or between the United States and Texas, which in any way expressly prevents or accepts the doctrines of accretion and avulsion as being applicable to the Rio Grande boundary between the above-stated latitudes.

█ █ Appellant insists that, by an unbroken line of decisions, in the courts of the various states of this Union, as well as in the Supreme Court of the United States, when a river is made a boundary, whether between individuals or nations, the ordinary doctrines of accretion and avulsion apply, that such doctrines apply in all civilized nations, and is one of the best established rules of international law, and that, by reason thereof, the doctrines of accretion and avulsion apply here, in extending the boundary between New Mexico and Texas in an easterly direction from its location in 1850 at the point in controversy, to where, by accretion, said boundary is alleged to be at the filing of this suit in January, 1928. In pursuance of such contention, appellant offered and was permitted to introduce much evidence as to the movements of the Rio Grande, both by accretion

and avulsion at the point here involved, appellant insisting that the Francisco Garcia lands, bordering the river immediately on the river on the west side and in the state of New Mexico, under which he claims title, followed the river easterly in its movement by accretion to the extent of embracing the lands claimed in his suit, some 200 acres.

Appellees answered by exceptions, not guilty, title from the state of Texas, pleas of improvements in good faith, pleas of limitation, etc., none of which we need discuss.

The trial court instructed the jury as follows: "Gentlemen of the Jury: The United States Supreme Court in the case of the State of New Mexico against the State of Texas has adjudicated that the land in controversy was in the State of Texas. This decree is binding on those two States, and is binding on parties claiming land under either of said States or their predecessors in title. You are therefore instructed that you will return a verdict in favor of the defendants."

The jury returned such verdict, and the court entered judgment for defendants (appellees here).

Without stating or discussing in detail the several propositions presented by appellant, or the counter propositions by appellees, we think it becomes necessary only to review the case referred to by the trial court as determining the merits of this case; that being the sole basis, as indicated, for the instructed verdict and judgment.

The states of New Mexico and Texas as set out in appellant's brief, have recently been engaged in a suit in the Supreme Court of the United States to determine their boundary in the vicinity in controversy; that is, between the thirty-second parallel of north latitude, and parallel 31 degrees and 47 minutes of north latitude. This suit was decided in favor of the state of Texas; the decision therein being set out in full in the statement of facts in this case at page 293, and being found under the style New Mexico v. Texas, 275 U. S. 279, 48 S. Ct. 126, 133, 72 L. Ed. 280, the decision modified in 276 U. S. 557, 48 S. Ct. 437, 72 L. Ed. 698.

The pleadings of the two states in that case are set out in an appendix to appellees' brief, from which we quote as much as we deem necessary to show the issues tendered in that case. The suit was brought in the Supreme Court of the United States by New Mexico by its Attorney General. The allegations of the state of New Mexico were, in part, as follows:

"Your orator further shows that by virtue of the provisions made by Congress in the said Act of September 9th, 1850, and by the acceptance thereof by the State of Texas, as set out in Exhibits A and B, the channel of the Rio del Norte, which is commonly called the Rio Grande, from the point where the 32nd parallel of North latitude intersected said channel in the year 1850 as the same existed at that time, became and was the Western and Southwestern boundary of said State of Texas, from said parallel to the Gulf of Mexico, and that said boundary has remained unchanged to the present time."

"Your orator further shows that that portion of the present State of New Mexico lying to the West of the Channel of said Rio Grande and between the parallel of 31 degrees and 47 minutes North latitude and the parallel of 32 degrees of North latitude, became a portion of the territory of the United States by virtue of a treaty between the United States and the Republic of Mexico, signed December 30th, 1853, and made public by the President of the United States on June 30th, 1854, commonly known as the Gadsden Treaty; and by an Act of Congress entitled 'An Act Declaring the Southern Boundary of New Mexico' which became a law on August 4th, 1854, the territory acquired under the said treaty with Mexico, commonly known as the Gadsden Treaty, was incorporated in the Territory of New Mexico so that the channel of the said Rio Grande between the parallel of 32 degrees North latitude and the parallel of 31 degrees 47 minutes of North latitude became and was the boundary between the State of Texas and the Territory of New Mexico and now is the boundary between the State of Texas and the State of New Mexico, a correct delineation of said boundary line in the middle of the channel of said Rio Grande, between said parallels of North latitude, being shown upon a map hereto attached and made a part hereof, marked "Exhibit C," which map contains a correct and accurate representation of all of the objects appearing thereon."

The state of New Mexico in said case then pleaded the provisions of an Act of Congress approved June 20, 1910 (36 Stat. 557), entitled "An Act to Enable the People of the States of New Mexico and Arizona to form Constitutions and State Governments, and to be admitted into the Union on an equal footing with the Original States; that such States formed such Constitutions and forms of Governments with its boundaries stated, and by Joint Resolution of Congress, approved August 21st, 1911, were admitted into the Union of States," then alleging:

"It is provided 'that the admission of New Mexico shall be subject to the terms and conditions of a Joint Resolution, approved February 16, 1911, and entitled "Joint Resolution Re-affirming the Boundary Line between Texas and the Territory of New Mexico,"' and your orator shows that by the terms of said last mentioned joint resolution re-affirming said boundary line, a copy of which is hereto attached and made a part hereof, marked 'exhibit E,' no change was made as to the boundary between Texas and New Mexico between the parallel of 32 degrees of North latitude and the parallel of 31 degrees and 47 minutes

of North latitude, but it merely re-affirmed boundary lines established and marked by John H. Clark in the years 1859 and 1860."

The bill then further alleged:

"Your orator further shows that the State of Texas has attempted to assume the jurisdiction over land lying to the west of the channel of the Rio Grande as it existed in the year 1850 * * *, and has made grants, conveyances, patents and surveys of such land which conflict with the rights and claims of owners of lands under grants made by the Republic of Mexico and confirmed by the authorities of the Government of the United States (then disclaiming sufficient knowledge or information to state how far to the West of the Rio Grande this State claims jurisdiction or the foundation of such claims, then alleging); which acts, doings, pretenses, and claims by the State of Texas are contrary to equity and good conscience and tend to manifest wrong, injury and oppression of your orator; and its citizens and owners of land within its boundaries.

"Wherefore, * * * and to the end * * * that the middle of the channel of the Rio Grande, as it existed in the year 1850 and as shown upon the map here before referred to, and which is attached hereto, be, by this Honorable Court, decreed to be the true boundary and line between the parallel of 32 degrees North latitude and the parallel of 31 degrees and 47 minutes of North latitude and that your orator may have such further or other relief as the nature of the case may require and to the court may seem meet."

The state of Texas, by its Attorney General, filed its answer. The answer contained the following allegations: After admitting certain matters pleaded by the state of New Mexico, which need not be here fully stated, but among the admissions the location of the boundary of this state on the north, the beginning point from which the boundary runs due west to the meridian of 103 degrees west of Greenwich, thence due south to the thirty-second degree of north latitude, thence on said parallel of 32 degrees north latitude to Rio Grande as it existed in 1850, and thence with its channel to the north of Mexico; admitted that that portion of the present state of New Mexico lying to the west of the channel of the Rio Grande as it existed on the date Texas was admitted into the Union and on September 9, 1850, and on December 13, 1850, and between parallel 31 degrees and 47 minutes north latitude and the parallel of 32 degrees north latitude, became a portion of the United States, and now comprises a part of the territory of the state of New Mexico, that the channel of the Rio Grande between said parallels of latitude became and was the boundary between the state of Texas and the territory of New Mexico, and is now the boundary between Texas and New Mexico; and further pleading:

"But this defendant denies that the delineation of said boundary line and the channel of the Rio Grande between said parallels, as shown in plaintiff's bill and by plaintiff's exhibit 'C,' made a part of this bill, is, in any respect, correct; and denies that same accurately represents any of the objects, lines or delineations appearing upon said exhibit 'C,' purporting to be a plat of the territory in controversy between said two parallels."

Defendant answering further:

"Denies that it has ever attempted, at any time since its admission into the Union, or since the year 1850, or since the years 1858 and 1859, when said Clark line was first run and established (under a joint resolution of the Congress of the United States and the State of Texas to resurvey and remark what is known as the 'Clark boundary line') to assume jurisdiction over or possession of any land lying to the west of the channel of the Rio Grande as it existed in the year 1850 between said parallels, or that defendant has made grants, conveyances, patents or surveys of any lands, at any time, not its own, but states that as it was fully authorized to do, it has made grants of lands, conveyances and patents to most of the lands lying eastward of the Rio Grande between said parallels, and that its citizens and others holding valid titles to said lands in the valley of the Rio Grande, between said parallels and adjacent to said river, are in possession of said lands so granted by it, and have been in possession of same for many years, paying taxes thereon to the County of El Paso and State of Texas, and this defendant and said land owners and claimants under it are the only persons entitled to hold said lands, or to have possession of the same, or any part of the same, and that said lands so granted and conveyed and so possessed and held have always been, and now are, a part of the territory of this defendant.

"Defendant denies that any of said grants or conveyances by it * * * conflict with any just rights and claims of any owners of lands holding under grants made by the Republic of Mexico and confirmed by the authorities of the Government of the United States. But defendant asserts that owners of pretended grants from the Republic of Mexico are endeavoring now, through plaintiff, and in this action * * * so to place the Rio Grande in 1850 as that all or most of the valley lands between said parallels will fall on the west side of the Rio Grande, as it existed in 1850, without justification in fact but in opposition to the line run by John H. Clark, as aforesaid. * * *

"Defendant says that all lands lying between parallels 31 degrees and 47 minutes and 32 degrees and lying east of the Rio Grande as same existed at the date of the adoption of the Treaty of Guadalupe Hidalgo and in the year 1850, and at the date when the line

was run between the Republic of Mexico on the South and East, and from the mouth of the Rio Grande up the channel to the 32nd degrees of North latitude, and at the date of the adoption of the Gadsden Treaty, became and was, and at all times since has been, a part of the territory of this defendant."

Defendant prayed that the boundary line between the plaintiff and defendant between said parallels be deemed and declared to be the "middle of the channel of the Rio Grande as it actually existed in the year 1850, or as found by the joint Commission of the United States and the Republic of Mexico, in the years 1852 and 1853."

New Mexico filed an answer to that portion of Texas' answer which constituted a cross-bill, in which answer plaintiff admits the true boundary line between said parallels as the said boundary line was fixed by the Act of Congress in 1850 (9 Stat. 447), but denies that said line between said parallels of latitude was fixed by either the Guadalupe Treaty or Gadsden Treaty, or the said Joint Resolution of Congress; denies that the true location of said boundary is as described in defendant's answer; admits that defendant had made grants of land and issued patents between said parallels of latitude and that defendant and the said landowners and claimants are the only persons entitled to hold or have possession of same actually lying east of the Rio Grande between said parallels as said river ran in 1850; but avers that defendant has not limited its attempt to assume jurisdiction over lands east of the channel of the Rio Grande as it existed in 1850, but to land west of said river, as complained of in its bill of complaint. The answer further traversed the statements in defendant's cross-bill, but which we think it not necessary to further state here.

A much briefer statement than the above is made by Mr. Justice Sanford, who delivered the opinion for the Supreme Court, and to which we refer. A few statements as to the issues joined in the Supreme Court, and the conclusion of the Court on such issues, are material and conclusive on the identical issues contended for here. Judge Sanford discussed at much length the evidence taken by the special master and the exceptions taken to the Master's report, and, for brevity, we refer to the opinion of the court for its observations with reference thereto.

On "accretions," the court, in the opinion as modified on rehearing, said:

"Both states have filed exceptions to the master's report in reference to accretions. Texas, on the one hand, insists that he was in error in reporting as the boundary line the location occupied by the river after it had been moved eastward from its location in 1850 by accretions. New Mexico, on the other hand, insists conditionally—that is, only if its exceptions as to the location in 1850 are not sustained—that in determining the accretions in the Country Club area the master fixed the line of such accretions in an indefinite manner and not far enough to the east. We find that the contention of Texas is well taken and the conditional contention of New Mexico is therefore immaterial. This case is not one calling for the application of the general rule established in Nebraska v. Iowa, 143 U. S. 359, 36 L. Ed. 186, 12 S. Ct. 396; Missouri v. Nebraska, 196 U. S. 23, 49 L. Ed. 372, 25 S. Ct. 155; Arkansas v. Tennessee, 246 U. S. 158, 62 L. Ed. 638, L. R. A. 1918D, 258, 38 S. Ct. 301 and Oklahoma v. Texas, 260 U. S. 606, 67 L. Ed. 428, 43 S. Ct. 221, as to changes in State boundary lines caused by gradual accretions on a river boundary. We reach this conclusion without reference to the fact that there were no issues under the pleadings as to accretions or changes in the boundary line since 1850, and without considering the propriety of permitting amendments to the pleadings, since in any event the outcome must be the same.

"By the legislative compact created by an Act of Congress of September 9, 1850, and an Act of the Texas Legislature of November 25, 1850, the channel of the Rio Grande southwardly from its intersection with the 32d parallel was established as a boundary between Texas and the territory of the United States. By this same Act of Congress the territory of New Mexico was created, and by that Act, supplemented by an Act of 1854 following the Gadsden Treaty, the channel of the river between the 32d parallel and the parallel of 31 degrees 47 minutes became a boundary between the Territory of New Mexico and the State of Texas.

"New Mexico, when admitted as a State in 1912, explicitly declared in its Constitution that its boundary ran 'along said thirty-second parallel to the Rio Grande * * * as it existed on the ninth day of September, one thousand eight hundred and fifty; thence, following the main channel of said river, as it existed on the ninth day of September, one thousand eight hundred and fifty, to the parallel of thirty-one degrees, forty-seven minutes north latitude.' This was confirmed by the United States by admitting New Mexico as a State with the line thus described as its boundary; and Texas has also affirmed the same by its pleadings in this cause. Since the Constitution defined its boundary by the channel of the river as existing in 1850, and Congress admitted it as a State with that boundary, New Mexico, manifestly, cannot now question this limitation of its boundary or assert a claim to any land lying east of the line thus limited. And it was doubtless for this reason that New Mexico alleged in its pleadings and has consistently asserted throughout this litigation that the true bound-

ary is the channel of the river as it existed in 1850.

"The exceptions of Texas to so much of the master's report as deals with the question of accretions and fixes the boundary with reference thereto, are accordingly sustained; and the conditional exceptions of New Mexico to so much of the report as relates to accretions in the Country Club area, are overruled."

Judge Sanford then writes his conclusion on the entire case as above indicated, fixing the boundary line between New Mexico and Texas in the area in dispute in the middle of the channel of the Rio Grande as it was located in 1850, and southwardly between said parallels of north latitude as found by the master.

The times of the movements of the Rio Grande by accretion and avulsion in the area of the lands in controversy, as alleged in plaintiff's pleadings, are the same in this case as in the case between New Mexico and Texas above referred to; that is, at times between 1850 and when New Mexico was admitted as a state.

We have concluded that the opinion of the Supreme Court in the case of New Mexico v. Texas necessarily controls and determines the issue as to boundary in the case at bar, and that the trial court was not in error in so instructing the jury and entering the judgment based on the verdict.

Appellant's propositions have been considered, and are overruled.

The case is affirmed.